IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF NEW YORK

_____

DAPHNE L. M. C.,

                    Plaintiff,

          v.                                    Civil Action No.
                                                1:21-CV-1135 (DEP)


COMMISSIONER OF SOCIAL SECURITY,

                    Defendant.

_____

APPEARANCES:                          OF COUNSEL:

FOR PLAINTIFF

LAW OFFICE OF                         JUSTIN GOLDSTEIN, ESQ.
KENNETH HILLER, PLLC
6000 North Bailey Ave., Suite 1A
Amherst, NY 14226

FOR DEFENDANT

SOCIAL SECURITY ADMIN.                NATASHA OELTJEN, ESQ.
OFFICE OF GENERAL COUNSEL
6401 Security Boulevard
Baltimore, MD 21235

DAVID E. PEEBLES
U.S. MAGISTRATE JUDGE


DECISION AND ORDER[1]

_____

[1]     This matter is before me based upon consent of the parties, pursuant to 28
U.S.C. § 636(c).

Plaintiff has commenced this proceeding, pursuant to 42 U.S.C. §

405(g), to challenge a determination of the Commissioner of Social

Security ("Commissioner") finding that she was not disabled at the relevant

times and, accordingly, is ineligible for the disability insurance ("DIB")

benefits for which she has applied.  For the reasons set forth below, I

conclude that the Commissioner's determination did not result from the

application of proper legal principles and is not supported by substantial

evidence.

I.    BACKGROUND

Plaintiff was born in September of 1975, and is currently forty-seven

years of age.  She was forty-two years old on January 18, 2018, the date

on which she claims she became disabled, and forty-three years old on

November 21, 2018, when she filed her application for benefits.  Plaintiff

stands five feet and four inches in height, and weighed approximately two

hundred and thirty-four pounds during the relevant time period.  Plaintiff

lives with her husband and twin minor children in Schenectady, New York.

In terms of education, plaintiff reports that she graduated from high

school and thereafter obtained an associate's degree in medical assisting.

She worked in the past as a certified nursing assistant ("CNA") and reports

that she suffered an injury to her foot while caring for one of her patients in

that capacity in January of 2017.[2]

Plaintiff alleges that she suffers primarily from complex regional pain syndrome ("CRPS") in her right ankle up to her right calf that was precipitated by the injury to her ankle and subsequent surgery in that area, and additionally that she experiences migraines and issues with her neck and arms that impact her ability to work and function.  She has received treatment for her ankle injury and ongoing issues related to that condition from sources at OrthoNY, CapitalCare Neurology, Capital Region Orthopedics Bone and Joint Center, New York Pain Management, and various independent medical examiners related to her claim for worker's compensation.

At the various administrative hearings conducted related to her claim for benefits, plaintiff has alleged that she is disabled as a result of the January 2017 workplace injury to her ankle.  She testified that surgery did not help, and in fact exacerbated her pain.  Sitting with her foot out in front of her or elevated helps alleviate the pain and swelling she experiences.  Plaintiff reports that the pain was initially only in her foot and ankle, but has since spread to her calf and thigh.  She uses a cane to ambulate even

---

[2]     There is evidence in the record suggesting the existence of a preexisting right ankle condition dating back to as early as 2008.  *See, e.g.*, Administrative Transcript ("AT") at 75, 758.

when at home.  Plaintiff further testified that she also experiences pain in her neck that radiates to her hands.

In terms of activities, plaintiff reports that she can do chores provided that she is able to take breaks or space them out over the course of the week, but that her children and husband also help.  She does not have a driver's license, and she likes to read books at home.  Plaintiff reported in 2019 that she did not believe she could perform seated work at a desk because of her issues with her hands and the need to elevate her leg.  She stated approximately a year later that she had been applying for secretary-type positions, but was having little success because of the impact of the COVID-19 pandemic and related shutdowns.  A few months later, in early 2021, plaintiff reported that she had been working for a few months in a sit-down job that requires her to work eight-hour shifts on Saturdays and Sundays, although her employer allows her to elevate her legs most of the time.

II.    PROCEDURAL HISTORY

A.    Proceedings Before the Agency

Plaintiff applied for DIB payments under Title II of the Social Security Act on November 21, 2018.  In support of her application, she claimed to be disabled due to CRPS in her right lower extremity.

A hearing was conducted on December 10, 2019, by ALJ David F. Neumann to address plaintiff's application for benefits.  ALJ Neumann issued an unfavorable decision on January 2, 2020.  On August 19, 2020, the Social Security Appeals Council ("Appeals Council") vacated that decision and remanded the matter for further consideration, including for the purpose of evaluation of the various opinions not explicitly analyzed by the ALJ in compliance with the governing regulations.  On November 17, 2020, and February 22, 2021, ALJ Neumann conducted additional administrative hearings to obtain updated information regarding plaintiff's claim, as well as testimony from a vocational expert and a medical expert. ALJ Neumann subsequently issued another unfavorable decision on March 16, 2021.  That opinion became a final determination of the agency on September 7, 2021, when the Appeals Council denied plaintiff's request for review of the ALJ's decision.

B.    The ALJ's Decision

In his most recent decision, ALJ Neumann applied the familiar, five-step sequential test for determining disability.  At step one, while noting that she reported some income in 2018 and 2020, he found that plaintiff has not engaged in substantial gainful activity during the relevant period. Proceeding to step two, ALJ Neumann found that plaintiff suffers from

severe impairments that impose more than minimal limitations on her ability to perform basic work functions, including morbid obesity, status post right ankle surgery to repair a partial tear of the posterior tibialis ligament with tendonitis, degenerative disc disease of the cervical spine with radiculopathy, migraine headaches, and asthma.  The ALJ further found that plaintiff's impairments of gastroesophageal reflux disorder ("GERD"), anxiety, and depression are not severe, and that her documented cardiac issue is not a medically determinable impairment.

At step three, ALJ Neumann examined the governing regulations of the Commissioner setting forth presumptively disabling conditions (the "Listings"), *see* 20 C.F.R. Pt. 404, Subpt. P, App. 1, and concluded that plaintiff's conditions do not meet or medically equal any of those listed conditions, specifically considering Listings 1.02, 1.04, 3.03, and the "neurological listings."  He also considered Social Security Rulings ("SSRs") 19-2p and 19-4p, related to the assessment of obesity and primary headache disorders, respectively, which are not covered by any specific listing.

ALJ Neumann next surveyed the available record evidence and concluded that, during the relevant time period, plaintiff retained the residual functional capacity ("RFC") to perform a reduced range of light

work with the following restrictions:

> she can lift and carry up to 20 pounds occasionally and 10 pounds frequently; can stand and walk with normal breaks for a total of at least four hours in an eight-hour workday; can sit with normal breaks for a total of six hours in an eight-hour workday; can occasionally overhead lift up to 5 pounds bilaterally; can perform pushing and pulling with upper extremities at aforementioned weight restrictions on a frequent basis; can frequently perform activities requiring bilateral manual dexterity for both gross and fine manipulation with handling and reaching; should avoid unprotected heights and moving machinery; should avoid concentrated pollutants and temperature extremes; should avoid concentrated vibrations to the right lower extremity; and can occasionally balance, stoop, kneel, crouch, crawl, and climb ramps and stairs.

ALJ Neumann found at step four that, with the above RFC, plaintiff is unable to perform her past relevant work as a CNA.  Proceeding to step five, based upon the testimony of a vocational expert ("VE"), the ALJ concluded that plaintiff remains able to perform available work in the national economy, citing as representative positions the jobs of office helper, parking lot cashier, and storage facility retail clerk.  The ALJ additionally recognized that the VE had alternatively testified that there would still be a significant number of jobs that plaintiff would be able to perform if she were limited to a full range of sedentary work with a need to elevate her leg parallel with the floor when seated and to use a cane when

7

not seated, including as election clerk, document preparer, and press

clippings trimmer.  Based upon these findings, ALJ Neumann concluded

that plaintiff was not disabled during the relevant period.

C.    This Action

Plaintiff commenced this action on October 19, 2021.[3]  In support of

her challenge to the ALJ's determination, plaintiff argues that the ALJ erred

in (1) failing to find that CRPS is a medically determinable severe

impairment and to factor the full effects of that impairment into his analysis,

(2) failing to find that limitations related to use of a cane and elevation of

the left leg were warranted for inclusion in the RFC, and (3) weighing the

various opinion evidence.  Dkt. No. 12.

Oral argument was conducted in this matter, by telephone, on

January 24, 2023, at which time decision was reserved.

III.   DISCUSSION

A.    Scope of Review

A court's review under 42 U.S.C. § 405(g) of a final decision by the

Commissioner is subject to a "very deferential" standard of review, and is

---

[3]       This action is timely, and the Commissioner does not argue otherwise.  It has
been treated in accordance with the procedures set forth in the recently enacted
Supplemental Security Rules and General Order No. 18.  Under those provisions, the
court treats the action procedurally as if cross-motions for judgment on the pleadings
have been filed pursuant to Rule 12(c) of the Federal Rules of Civil Procedure.

limited to analyzing whether the correct legal standards were applied, and whether the decision is supported by substantial evidence.  *Brault v. Soc. Sec. Admin., Comm'r*, 683 F.3d 443, 448 (2d Cir. 2012); *Veino v. Barnhart*, 312 F.3d 578, 586 (2d Cir. 2002); *Shaw v. Chater*, 221 F.3d 126, 131 (2d Cir. 2000); *Schaal v. Apfel*, 134 F.3d 496, 501 (2d Cir. 1998).  Where there is reasonable doubt as to whether the ALJ applied the proper legal standards, the decision should not be affirmed even though the ultimate conclusion reached is arguably supported by substantial evidence. *Johnson v. Bowen*, 817 F.2d 983, 986 (2d Cir. 1987).  If, however, the correct legal standards have been applied, and the ALJ's findings are supported by substantial evidence, those findings are conclusive, and the decision will withstand judicial scrutiny regardless of whether the reviewing court might have reached a contrary result if acting as the trier of fact. *Veino*, 312 F.3d at 586; *Williams v. Bowen*, 859 F.2d 255, 258 (2d Cir. 1988); *see also* 42 U.S.C. § 405(g).

The term "substantial evidence" has been defined as "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion."  *Richardson v. Perales*, 402 U.S. 390, 401 (1971) (quoting *Consol. Edison Co. v. NLRB*, 305 U.S. 197, 229 (1938)); *accord, Jasinski v. Barnhart*, 341 F.3d 182, 184 (2d Cir. 2003).  To be substantial, there must

be "more than a mere scintilla" of evidence scattered throughout the

administrative record.  *Richardson*, 402 U.S. at 401 (internal quotation

marks omitted); *Williams*, 859 F.3d at 258.  "To determine on appeal

whether an ALJ's findings are supported by substantial evidence, a

reviewing court considers the whole record, examining evidence from both

sides, because an analysis on the substantiality of the evidence must also

include that which detracts from its weight."  *Williams*, 859 F.2d at 258

(citing *Universal Camera Corp. v. NLRB*, 340 U.S. 474, 488 (1951);

*Mongeur v. Hechler*, 722 F.2d 1033, 1038 (2d Cir. 1983)).

     B.    <u>Disability Determination: The Five-Step Evaluation Process</u>

The Social Security Act ("Act") defines "disability" to include the

"inability to engage in any substantial gainful activity by reason of any

medically determinable physical or mental impairment which can be

expected to result in death or which has lasted or can be expected to last

for a continuous period of not less than 12 months[.]"  42 U.S.C. §

423(d)(1)(A).  In addition, the Act requires that a claimant's

> physical or mental impairment or impairments [be] of
> such severity that he is not only unable to do his
> previous work but cannot, considering his age,
> education, and work experience, engage in any other
> kind of substantial gainful work which exists in the
> national economy, regardless of whether such work
> exists in the immediate area in which he lives, or
> whether a specific job vacancy exists for him, or

whether he would be hired if he applied for work.

*Id.* § 423(d)(2)(A).

The agency has prescribed a five-step evaluative process to be employed in determining whether an individual is disabled.  *See* 20 C.F.R. §§ 404.1520, 416.920.  The first step requires a determination of whether the claimant is engaging in substantial gainful activity; if so, then the claimant is not disabled, and the inquiry need proceed no further.  *Id.* §§ 404.1520(b), 416.920(b).  If the claimant is not gainfully employed, then the second step involves an examination of whether the claimant has a severe impairment or combination of impairments that significantly restricts his or her physical or mental ability to perform basic work activities.  *Id.* §§ 404.1520(c), 416.920(c).  If the claimant is found to suffer from such an impairment, the agency must next determine whether it meets or equals an impairment listed in Appendix 1 of the regulations.  *Id.* §§ 404.1520(d), 416.920(d); *see also id.* Part 404, Subpt. P, App. 1.  If so, then the claimant is "presumptively disabled."  *Martone v. Apfel*, 70 F. Supp. 2d 145, 149 (N.D.N.Y. 1999) (citing *Ferraris v. Heckler*, 728 F.2d 582, 584 (2d Cir. 1984)); 20 C.F.R. §§ 404.1520(d), 416.920(d).

If the claimant is not presumptively disabled, step four requires an assessment of whether the claimant's RFC precludes the performance of

his or her past relevant work.  20 C.F.R. §§ 404.1520(e), (f), 416.920(e), (f).

If it is determined that it does, then as a final matter, the agency must

examine whether the claimant can do any other work.  *Id.* §§ 404.1520(g),

416.920(g).

The burden of showing that the claimant cannot perform past work

lies with the claimant.  *Perez v. Chater*, 77 F.3d 41, 46 (2d Cir. 1996);

*Ferraris*, 728 F.2d at 584.  Once that burden has been satisfied, however, it

becomes incumbent on the agency to prove that the claimant is capable of

performing other available work.  *Perez*, 77 F.3d at 46.  In deciding whether

that burden has been met, the ALJ should consider the claimant's RFC,

age, education, past work experience, and transferability of skills.  *Ferraris*,

728 F.2d at 585; *Martone*, 70 F. Supp. 2d at 150.

    C.    <u>Analysis</u>

        1.    <u>The ALJ's Assessment of CRPS</u>

Plaintiff argues that the ALJ erred in not finding that CRPS is a

severe impairment from which she suffers, and in failing to consider the

additional effects of that condition when making his other findings.  Dkt. No.

12.

SSR 03-2p provides the relevant agency guidance for assessing

cases in which CRPS is present or suspected.  It provides, in relevant part,

that CRPS "constitutes a medically determinable impairment when it is documented by appropriate medical signs, symptoms, and laboratory findings." SSR 03-2p. It further states that CRPS

> can be established in the presence of persistent complaints of pain that are typically out of proportion to the severity of any documented precipitant and one or more of the following clinically documented signs in the affected region at any time following the documented precipitant:
> - Swelling;
> - Autonomic instability – seen as changes in skin color or texture, changes in sweating (decreased or excessive sweating), changes in skin temperature, and abnormal pilomotor erection (gooseflesh);
> - Abnormal hair or nail growth (growth can be either too slow or too fast);
> - Osteoporosis; or
> - Involuntary movements of the affected region of the initial injury.

SSR 03-2p. SSR 03-2p further notes that the above signs do not need to be present continuously in order for CRPS to be deemed a medically determinable impairment, and that in fact "[t]ransient findings are characteristic of" CRPS. SSR 03-2p.

After discussing much of the relevant evidence, including assessments by Dr. Rosas, Dr. Parikh, and Dr. Soyer, all of whom concluded that plaintiff has CRPS, the ALJ concluded that CRPS or a related disorder is not a medically determinable impairment. Administrative

Transcript ("AT") at 23.[4]  The ALJ stated that he had "considered SSR 03-02p but [had] found persuasive the assessments of orthopedist Jordan Lisella, M.D., and independent occupational medicine examiner Dominic Belmonte, M.D."  AT 23.  The ALJ noted that both of those sources had conducted examinations of plaintiff at various times and explicitly disagreed with the assessments that plaintiff has CRPS based on their reviews of the medical findings from their own examinations and those of Dr. Rosas, Dr. Parikh, and Dr. Soyer.  AT 23.  The ALJ also found "most persuasive" the testimony of medical expert Dr. Golub, which he characterized as stating that "evidence of record was not consistent with a diagnosis of complex regional pain syndrome."  AT 23.

As can be seen from the ALJ's explanation, this is a case involving disagreement among the relevant physicians regarding whether or not plaintiff suffers from CRPS.  In July of 2018, Dr. Soyer assessed plaintiff with "early CRPS," noting observations on his examination of tenderness, minimal to moderate swelling, allodynia, mild discoloration, and moderate sensory loss in the right ankle, with a slightly larger calf circumference on the right compared with the left.  AT 715-16.  Dr. Rosas stated in August of

---

[4]      The administrative transcript is found at Dkt. No. 8, and will be referred to throughout this decision as "AT ___."

2018 that plaintiff was being treating by him for "suspected" CRPS, and

more concretely reported in November of 2018 that plaintiff "has symptoms

consistent with" CRPS, noting observations of tenderness to even very light

touch over her medial ankle and hindfoot with diminished motion and

strength in the ankle.  AT 517-18, 686.  In April of 2019, Dr. Parikh

indicated, in assessing the plaintiff with CRPS, that her medical history

included nondermatomal pain with intermittent swelling and hypersensitivity

in her right lower extremity following her injury and subsequent surgery,

and noted that she was observed to have "persistent hypersensitivity," with

her right foot slightly cooler than the left, but no evidence of dermal

breakdown.  AT 688-89.  In June of 2019, Dr. Soyer assessed CRPS,

noting observations of tenderness, minimal soft tissue swelling, mild to

moderate sensory loss, allodynia and hyperpathia[5] in her right lower

extremity.  AT 707.  He further observed that the right calf was slightly

smaller around than the left, there was no significant discoloration, and

there was abnormal nail growth in both feet, although he noted plaintiff

reported limited nail growth on the right.  AT 707.

---

[5]     Allodynia is defined as pain from a stimulus that would not normally cause pain, while hyperpathia is an increased response to stimuli. *See Allodynia*, Merriam-Webster, https://www.merriam-webster.com/dictionary/allodynia; *Hyperpathia*, Merriam-Webster, https://www.merriam-webster.com/medical/hyperpathia.

In contrast with the views of those professionals, other sources have found it unlikely that plaintiff has CRPS.  In May of 2019, Dr. Lisella stated that he "doubt[ed] that she has CRPS based on physical exam," which showed "severe pain over the posterior tibial tendon but minimal pain over the dorsum or lateral side of the foot and minimal pain over the plantar aspect of her foot."  AT 645.  He suspected instead, based on her pain distribution, that the problem was likely related to her posterior tibial tendon and requested repeat magnetic resonance imaging ("MRI") testing to assess the condition of that.  AT 645.  In the following months, after receiving the results of the MRI that showed no pathology of the posterior tibial tendon, Dr. Lisella continued to seek authorization through Worker's Compensation to conduct both a nerve study and a reconstructive surgery on her ankle.  AT 643-44.  In November of 2018, after reviewing treatment records by Dr. Rosas, Dr. Parikh, and Dr. Soyer, among others, and conducting a physical examination showing a slightly smaller calf girth on the right than the left, generally consistent temperature and color between her two feet, and a lack of dystrophic skin changes, Dr. Belmonte concluded that "none of the available medical reports, as well as her current clinical examination on today's date, note findings consistent with the CRPS diagnosis."  AT 757-58.  He further stated that "although

[plaintiff] has significant global complaints of pain involving her right foot, those complaints are not consistent with the specific diagnosis of chronic regional pain syndrome."  AT 758.  In September of 2019, Dr. Belmonte, although disagreeing with Dr. Lisella's recommendation of further surgery, also reaffirmed his views that plaintiff does not have CRPS because of his belief that the clinical findings do not support that diagnosis.  AT 751. Lastly, at the most recent administrative hearing in 2021, Dr. Golub, after reviewing all of the pertinent evidence in the record, agreed with Dr. Lisella and Dr. Belmonte that the evidence does not support a diagnosis of CRPS. AT 112-13, 118-19.

I find the ALJ's reliance on the opinions of Dr. Golub, Dr. Lisella, and Dr. Belmonte to be insufficient to provide substantial evidence to support his finding that CRPS was not a medically determinable impairment. Although it is true generally that an ALJ may not substitute his lay opinion or assessment of the medical evidence for those of medical sources, that general proposition does not apply with the same force when assessing whether a certain medically determinable impairment exists.  Specifically, both SSR 03-2p and 20 C.F.R. § 404.1521, which addresses how the agency will establish the presence of a medically determinable impairment, provide that the ALJ should rely on "appropriate medical signs, symptoms,

and laboratory findings" or, stated a different way, "medically acceptable clinical and laboratory diagnostic techniques."  20 C.F.R. § 404.1521; SSR 03-2p.  The relevant regulation also specifically explains that the agency "will not use your statement of symptoms, *a diagnosis, or a medical opinion* to establish the existence of an impairment."  20 C.F.R. § 404.1521 (emphasis added).  Accordingly, if the relevant signs and symptoms were documented in the objective medical evidence, the fact that some physicians disagreed with the diagnosis of CRPS is insufficient to justify a decision to not find CRPS to be a medically determinable impairment.  The summary of the examinations above appears to suggest that plaintiff did variously display some swelling, some changes in skin temperature, and abnormal nail growth in the relevant foot in addition to observations that she appeared to fairly consistently have hypersensitivity or pain out of proportion with her injury.  As such, I conclude that the ALJ's finding that CRPS is not a medically determinable impairment, which appears to have been based on the opinions of the various physicians rather than his assessment of the presences of the signs and symptoms, is not supported by substantial evidence.

2.    The ALJ's Findings Regarding Use of a Cane and Leg Elevation

Plaintiff next argues that the ALJ erred in failing to include in the RFC

finding any limitation for plaintiff's use of a cane or a need to elevate her leg during the workday.  Dkt. No. 12, at 20-22.  In making this argument, plaintiff cites observations from the medical records documenting swelling in her right leg, as well as abnormal gait and use of a cane during examinations as support for those proposed limitations.  *Id.*

### a.  Use of a Cane

Regarding cane use, the ALJ acknowledged with careful detail the treatment evidence indicating observations of abnormal gait and use of a cane.  AT 21-24.  He concluded, however, that the record, "reflect[ed] consistent clinical findings but without any indication of swelling, edema, or need for a cane."  AT 23.  The ALJ indicated that, although the record certainly documents that plaintiff used a cane at many appointments, there was no statement or indication by any of the physicians who examined her that it was medically necessary for her to use a cane, and in fact, certain evidence suggested that plaintiff's gait remained similar whether or not she used her cane.  AT 21-24.  The ALJ also noted that consultative examiner Dr. Kautilya Puri specifically stated that she did not believe that plaintiff's cane was medically necessary.  AT 26 (citing AT 627-28).

I find the ALJ's conclusions regarding use of a cane to be supported by substantial evidence.  This is not a case in which the ALJ failed

altogether to provide an analysis of the evidence related to cane use.  As

has already been discussed, the ALJ appears to have been well aware of

the fact that plaintiff used a cane at many of her examinations, but found

that the evidence showed that plaintiff's gait did not appear to change as a

result of cane use and that there is no indication that a cane is medically

necessary.  SSR 96-9p states that, in order for a handheld assistive device,

such as cane, to be deemed medically necessary, "there must be medical

documentation establishing the need for a hand-held assistive device to aid

in walking or standing, and describing the circumstances for which it is

needed."  SSR 96-9p.  I note that, despite the multitude of physical

functional assessments completed by the independent medical examiners

and other physicians in this case, no medical source stated that plaintiff

requires the use of a cane, much less described in which specific situations

she would require one.  AT 537, 541, 545, 549.  Further, Dr. Puri

specifically opined that she did not feel that plaintiff's use of a cane was

necessary based on the observations of her use of it during the

examination.  AT 627.  Because no medical source has opined that

plaintiff's use of a cane is medically necessary and the ALJ seems to have

afforded significant consideration to whether a cane was necessary and

explained why he found it was not, I find no error in the ALJ's choice to not

include use of a cane in the RFC finding.  Plaintiff's argument to the

contrary, which merely points to the fact that plaintiff used a cane at various

examinations, represents little more than a request to reweigh the

evidence, something which this court is not permitted to do.  *See Melanie*

*L. v. Comm'r of Soc. Sec.*, 22-CV-0087, 2022 WL 17992220, at *9-10

(N.D.N.Y. Dec. 29, 2022) (Baxter, M.J.) (rejecting a similar argument,

concluding that the plaintiff's citation to instances where she used a cane

was little more than a disagreement with the way the ALJ weighed the

evidence).  The fact that plaintiff used a cane does not automatically

indicate that it was medically necessary, and I find the ALJ's explanation

and conclusion in this case to be reasonable and generally consistent with

the applicable standard for making such a determination.

> b.   Leg Elevation

Somewhat similarly, plaintiff argues that the ALJ erred in failing to

include any limitation allowing her to elevate her legs during the workday,

citing to a few instances on examinations where sources observed swelling

in her ankle.  Dkt. No. 12, at 20-21.  However, a few notations of swelling

do not necessarily require a finding that a plaintiff would need to elevate

her legs during the workday.  I note, as with use of a cane, none of the

medical sources who provided opinions regarding plaintiff's ability to

function indicated that any need to elevate the legs existed.  Plaintiff states that Dr. Soyer "noted that Plaintiff could not sit very long and had to elevate her ankle," but the cited treatment note makes clear that this statement regarding plaintiff's need to elevate her ankle was based on a subjective complaint reported by plaintiff, and was not Dr. Soyer's own opinion.  AT 535; Dkt. No. 12, at 20.  Notably, his opinion contained within the same treatment record does not substantiate any limitation related to elevation of the leg.  AT 537.  The ALJ acknowledged that plaintiff was observed on a few occasions as having minimal soft tissue swelling in her right ankle, particularly close in time after her 2017 injury, and also correctly noted that other examinations generally revealed no significant edema or swelling.  AT 21-23.  Given particularly the absence of any medical opinion inconsistent with the ALJ's omission of a limitation regarding leg elevation, I do not find the ALJ's conclusion in this respect to be an unreasonable assessment of the evidence, and therefore find no error.

### 3.    The ALJ's Assessment of the Opinion Evidence

Plaintiff lastly argues that the ALJ erred in his assessment of the available opinion evidence.  Dkt. No. 12, at 17-20, 22-25.  Because plaintiff's application was filed after March 27, 2017, this case is subject to the amended regulations regarding opinion evidence. Under those

regulations, the Commissioner "will not defer or give any specific evidentiary weight, including controlling weight, to any medical opinion(s), . . . including those from your medical sources," but rather will consider whether those opinions are persuasive by primarily considering whether the opinions are supported by and consistent with the record in the case.  20 C.F.R. § 416.920c(a); *see* 82 Fed. Reg. 5844-01, 2017 WL 168819, at *5853 (stating that, in enacting the new regulations, the agency was explicitly "not retaining the treating source rule").  An ALJ must articulate in his or her determination as to how persuasive he or she finds all of the medical opinions and explain how he or she considered the supportability[6] and consistency[7] of those opinions.  20 C.F.R. § 416.920c(b).  The ALJ also may – but is not required to – explain how he or she considered the other relevant enumerated factors related to the source's relationship with the claimant, including the length of any treatment relationship, the

---

[6]     On the matter of supportability, the regulations state that "[t]he more relevant the objective medical evidence and supporting explanations presented by a medical source are to support his or her medical opinion(s) or prior administrative medical finding(s), the more persuasive the medical opinion or prior administrative medical findings(s) will be." 20 C.F.R. § 416.920c(c)(1).

[7]     On the matter of consistency, the regulations state that "[t]he more consistent a medical opinion(s) or prior administrative medical finding(s) is with the evidence from other medical sources and nonmedical sources in the claim, the more persuasive the medical opinion(s) or prior administrative medical finding(s) will be."  20 C.F.R. § 416.920c(c)(2).

frequency of examinations by the source and the purpose and extent of the

treatment relationship, whether the source had an examining relationship

with the claimant, whether the source specializes in an area of care, and

any other factors that are relevant to the persuasiveness of that source's

opinion.  20 C.F.R. § 416.920c(c).

The ALJ found many of Dr. Soyer's various opinions from 2017 and

2018 to be generally persuasive inasmuch as they indicate an ability to lift

and carry twenty pounds occasionally and ten pounds frequently, and a

need to avoid ladders and repetitive stair climbing.  AT 27.  The ALJ,

however, found less persuasive his July 2018 report, in which Dr. Soyer

expressed his opinion that plaintiff can perform only sedentary work –

including lifting up to ten pounds and avoiding prolonged standing or

walking – specifically for an eight-week period, explaining that this opinion

appeared to be based in large part on "assessments of [CRPS] not

supported in the record without notable change in his own clinical findings."

AT 27.

The ALJ found Dr. Belmonte's assessments from November of 2018

and September of 2019, in which he stated that plaintiff would need to

avoid prolonged standing, walking, and climbing, but would be able to

return to sedentary work if she was "sufficiently motivated," to be

unpersuasive.  AT 27, 558, 752.  To explain this finding, the ALJ stated that (1) there was no indication plaintiff participated in a work hardening program as suggested by Dr. Belmonte, and (2) despite her antalgic gait, there is no evidence of joint instability or for a finding that she required a cane.  AT 27.  The ALJ did, however, find persuasive the portion of Dr. Belmonte's opinion that indicated plaintiff could lift and carry up to twenty pounds.  AT 27.

The ALJ next found the opinion of consultative examiner Dr. Puri to be generally persuasive because the mild and moderate limitations therein are reasonably consistent with the medical evidence, but found that the portion of the opinion concluding that plaintiff cannot stand or walk for "long periods" on a "short term basis" is too vague and inconsistent with the evidence of no instability in the ankle, and found that greater manipulative limitations were warranted based on the evidence related to plaintiff's upper extremities.  AT 27-28.

The ALJ found the opinions of the non-examining state agency medical consultants, Dr. J. Rosenthal and Dr. S. Siddiqui, to be partially persuasive, noting that he particularly found the lifting, carrying, sitting, postural, and environmental limitations to be reasonably supported, but found the limitation to standing or walking for only two hours to be

inconsistent with the lack of joint instability and generally intact lower extremity strength.  AT 28.

Lastly, the ALJ found the opinion from testifying medical expert Dr. Golub to be most persuasive, finding it to be consistent with the objective medical findings in the record, including the conservative care she received after her 2017 surgery and the fact that records generally showed "intact strength, sensory, reflexes, and ranges of motion without documented ankle instability," despite significant deficits in ankle range of motion, strength, and antalgic gait.  AT 28.  Dr. Golub opined that, based on his review of all of the evidence, plaintiff can lift and carry ten pounds frequently and twenty pounds occasionally, lift weight greater than five pounds overhead only occasionally, sit for six hours in an eight-hour day, stand and walk at least four hours in an eight-hour day, frequently reach, handle, finger, and feel, occasionally perform postural activities such as stooping, kneeling and crawling, and avoid exposure to unprotected heights and moving machinery, extreme cold, and rigorous vibrations in the right lower extremity.  AT 115-17.

I find that the ALJ's assessment of the above opinions is flawed and merits remand for further proceedings because the ALJ has failed to provide sufficient rationale from which to assess whether his conclusions

26

are supported by substantial evidence.  The ALJ's RFC finding relies heavily on the opinion from Dr. Golub, in that it essentially represents wholesale adoption of that opinion.  Yet, the ALJ's reasons for relying on that opinion raise questions regarding whether that action is supported by substantial evidence.

As to the ALJ's reliance on the conservative nature of plaintiff's treatment following her 2017 surgery as a basis to discount contrary opinions and rely heavily on that of Dr. Golub, to the extent that it is illuminating about plaintiff's functional abilities, the ALJ appears to disregard the context of the evidence in the record.  Although plaintiff did receive fairly conservative treatment, that does not mean that more intrusive treatments were not suggested or even recommended.  Indeed, the record shows that Dr. Parikh, as her pain management physician, wanted to pursue a spinal cord stimulator trial in late 2018, but that treatment was seemingly not approved by Worker's Compensation.  AT 520, 557.  Further, Dr. Lisella sought approval to perform a reconstructive surgery on plaintiff's ankle in mid-2019, but Dr. Belmonte essentially recommended that Worker's Compensation deny that request in September of 2019.  AT 643-44, 751.  The ALJ's reliance on the conservative nature of plaintiff's treatment following her surgery therefore

27

ignores that the record shows that physicians had prescribed greater

treatments, but those treatments could not be pursued both because

physicians disagreed as to the source of plaintiff's pain and other

symptoms, and because Worker's Compensation did not approve any of

those treatments.  The ALJ acknowledged in a portion of his summation of

the treatment evidence that treatments suggested by Dr. Parikh, Dr. Rosas,

and others were denied by Worker's Compensation, but he does not

explain how such rejection necessarily implies anything about plaintiff's

symptoms or functioning.  AT 23.  It is therefore not clear to me that the

ALJ's reliance on Dr. Golub's opinion as being consistent with a history of

conservative treatment is supported by substantial evidence.

The ALJ's other reason for relying on Dr. Golub's opinion is the fact

that he found it to be consistent with the evidence in the record, particularly

the various normal findings that were documented despite some evidence

of ongoing loss of ankle range of motion and antalgic gait.   Although the

ALJ has the responsibility of weighing conflicting evidence, I am simply not

convinced that the ALJ's conclusions in this case are supported by

substantial evidence.  To his credit, the ALJ provides a lengthy summary of

the evidence in his decision, showing clearly that he considered that

evidence.  However, his statement related to Dr. Golub's opinion, to the

effect that the record contains generally normal observations other than consistently decreased range of motion and an antalgic gait, is not even consistent with his own summation of the treatment evidence. AT 21-23. Notably, despite stating, in support of Dr. Golub's opinion, that the record showed normal findings regarding plaintiff's sensory functioning, the ALJ had previously acknowledged that Dr. Soyer observed on multiple consecutive occasions in 2018 and 2019 that plaintiff presented with sensory loss in her foot and calf and at least slightly diminished – 5-/5 – strength in that extremity. AT 22. He further acknowledged that, in May of 2018, plaintiff displayed hypersensitivity in her right leg with diminished range of motion and diminished strength with some movement of her foot, and that Dr. Parikh observed dysesthesias along her right posterior tibial nerve in June of 2018. AT 22-23. Indeed, the evidence from the last half of 2018 in particular consistently reflects that plaintiff was observed to have hypersensitivity or other sensory abnormality in her right foot and calf, tenderness to even light touch, and limited ankle range of motion. AT 517, 519, 545, 686, 766. Such observations of abnormal sensation, gait, range of motion, and use of a cane persisted in 2019. AT 627-28, 688, 707, 750, 764, 784. The evidence therefore squarely undermines the ALJ's conclusion in support of Dr. Golub's opinion that the record evidence shows

"substantially intact strength, sensory, reflexes, and ranges of motion without documented ankle instability."  AT 28.  Because the ALJ's explanation for affording Dr. Golub's opinion, particularly regarding plaintiff's ability to stand and walk, such significant weight conflicts with his own summation of the medical treatment evidence, I find that such basis for adopting that opinion is not supported by substantial evidence.  I note also, as plaintiff has pointed out, that Dr. Golub's opinion is the only one which clearly suggests an ability to stand and walk in excess of the two hours in an eight-hour workday as opined by the state agency non-examining consultants, making the ALJ's failure to provide an adequate explanation of how the evidence supports that opinion to be particularly troublesome.

Further, as to the ALJ's assessments of the other opinion evidence, the ALJ's explanations related to the persuasiveness afforded to each of those opinions generally either fail to appropriately consider the relevant factors of consistency and supportability or are permeated by the same inadequate assessment of the evidence that has already been discussed. Specifically, in finding Dr. Belmonte's opinions regarding plaintiff's need to avoid prolonged standing and walking and a general capacity to perform only "sedentary work" to be unpersuasive, the ALJ's sole explanation for that finding is that there is no indication that plaintiff underwent a vocational

rehabilitation program, as Dr. Belmonte suggested, nor was there evidence of joint instability or medical necessity for use of a cane.  AT 27.  Similarly, the ALJ rejected Dr. Soyer's opinions regarding no prolonged walking or standing based solely on the fact it appeared to be based "in large part" on CRPS without any notable change in his own clinical findings.  AT 27. Neither of these explanations appears to consider both the supportability and consistency of the opinions related to the wealth of relevant evidence available, and, to the extent the ALJ relies on his summary of the evidence to do the heavy lifting, that extrapolation experiences the problem that, as was already discussed, the ALJ has not appeared to fully acknowledge the extent of the clinical observations made in the treatment notes despite including them in that summary.  Notably, in finding the limitation to standing and walking only two hours in an eight-hour workday from the non-examining state agency medical consultants to be unpersuasive, the ALJ found that limitation was not substantiated by the evidence, specifically citing the fact that plaintiff's ankle joint is stable "with generally intact strength in the lower extremities."  AT 28.  That explanation again appears to ignore the import of the numerous consistent abnormal findings that were observed on examinations in favor of a few normal findings.

Lastly, having found that the ALJ has committed error in weighing the

opinion evidence, I must next determine whether that error can be considered harmful.  This case is somewhat unusual in that the ALJ made an alternative step five finding based on the vocational expert's testimony elicited in response to a hypothetical question posed by plaintiff at the administrative hearing.  AT 30-31.  Specifically, plaintiff questioned the vocational expert as to whether an individual limited to sedentary work with a need to elevate her leg throughout the workday and to use a cane during any periods of standing or walking would be able to perform any jobs in the national economy, in response to which the vocational expert testified that three sedentary jobs could be performed with accommodations that would be permitted pursuant to the Americans with Disabilities Act.  AT 30-31. The ALJ acknowledged in his decision that plaintiff would therefore not be considered disabled even if he were to adopt the restrictions included in that hypothetical question.  AT 31.

I find that this testimony and the ALJ's finding related to it are insufficient to render the errors in this case harmless.  Although, as was discussed above, the ALJ's rejection of limitations related to plaintiff's alleged need to use a cane and to elevate her legs are supported by substantial evidence, the vocational expert's testimony that jobs would exist

with the sedentary range of work simply does not suffice in this case.[8]  The

hypothetical question did not include any of the non-exertional restrictions

that were ultimately included in the current RFC, including restrictions in

plaintiff's ability to use her arms and hands, lift overhead, and perform

various postural and environmental restrictions.  AT 20.  Therefore, to the

extent that those restrictions have not been challenged and would possibly

again be found to exist on remand, the vocational expert's testimony does

not account for the effect such restrictions might have on the ability to

perform the identified jobs.  Particularly, it is not clear to me that the

limitation regarding occasionally lifting five pounds overhead is clearly

encompassed by the Dictionary of Occupational Titles or the Selected

Characteristics of Occupations.  *See Eric M. v. Comm'r of Soc. Sec.*, 17-

CV-1182, 2019 WL 762220, at *4 (N.D.N.Y. Feb. 21, 2019) (Baxter, M.J.)

(finding there was a conflict that the ALJ failed to resolve between the VE's

testimony that plaintiff could perform certain jobs with a limitation for no

over-the-shoulder work despite the specification in the Dictionary of

---

[8]     Although I acknowledge the arguments related to whether the ability to elevate
her leg would be considered a "reasonable accommodation" under the Americans with
Disabilities Act that were presented in the parties' supplemental briefing after oral
argument, I conclude that this issue is not dispositive in this case because, as was
discussed, the ALJ provided proper reasons supported by substantial evidence for
declining to include any such limitation, and no medical source rendered an opinion to
state that plaintiff required any such leg elevation during the workday.

Occupational Titles and Selected Characteristics of Occupations that such jobs required the ability to reach frequently) (collecting cases). Specifically, the sedentary jobs of document preparer and press clipping trimmer both require the ability to frequently reach according to the Selected Characteristics of Occupations, which suggests that plaintiff might not be able to perform the requirements of those jobs, as lifting overhead arguably might require overhead reaching and the ALJ found plaintiff limited to only occasionally lifting overhead. These are questions that can only be answered by a vocational expert, and they were not asked in this case. The only remaining provided sedentary job of election clerk, which admittedly requires only occasional reaching according to the Selected Characteristics of Occupations, would likely not constitute a sufficient number of jobs in the national economy to sustain the ALJ's alternative step five finding. AT 30-31 (indicating that such job has only 6,732 national positions). Further, the evidence is such that it is not a foregone conclusion that the ALJ would limit plaintiff to a wholly typical level of sedentary work without the postural and other nonexertional limitations that are included in the current RFC finding, particularly in light of the ALJ's failure to also properly consider CRPS to be a medically determinable impairment, as it is not clear how that finding impacted the ultimate assessment of limitations in

34

the RFC.  Because there remain pertinent issues to be analyzed on remand that can affect the validity of the ALJ's alternative step five finding, I find that the vocational expert's testimony does not provide a sufficient basis on which to find the errors committed by the ALJ in this case to be harmless.

Based on the above, I find that remand is warranted for further consideration of the opinion evidence in this case.  Further, consistent with the agency's procedure in situations where the same ALJ has already heard a claimant's case twice, this case should be reassigned to a new ALJ for further proceedings.

IV.   SUMMARY AND ORDER

After considering the record as a whole and the issues raised by the plaintiff in support of her challenge to the Commissioner's determination, I find that the determination did not result from the application of proper legal principles and is not supported by substantial evidence.  Accordingly, it is hereby

ORDERED that plaintiff's motion for judgment on the pleadings (Dkt. No. 12) be GRANTED, defendant's motion for judgment on the pleadings (Dkt. No. 17) be DENIED, the Commissioner's decision be VACATED, and this matter remanded for further proceedings consistent with this decision

and order, without a directed finding of disability, pursuant to sentence four

of 42 U.S.C. § 405(g); and it is further respectfully

ORDERED that the clerk enter judgment consistent with this opinion.

Dated:      February 17, 2023
            Syracuse, NY

_____
DAVID E. PEEBLES
U.S. Magistrate Judge